**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| DONALD WEBER, individually and as the representative of a class of similarly situated persons, and on behalf of The Crete Carrier 401(k) Profit Sharing Plan,<br><br>Plaintiff,<br><br>V.<br><br>CRETE CARRIER CORPORATION; UNION BANK & TRUST COMPANY; TONN OSTERGARD; and JOHN and JANE DOES 1-10,<br><br>Defendants. | Civil Action No.:<br><br>COMPLAINT<br><br>CLASS ACTION |

## NATURE OF THE ACTION

Plaintiff Donald Weber ("Plaintiff") brings this class action lawsuit on behalf of his retirement plan, himself, and other similarly situated individuals.

Defendants Crete Carrier Corporation ("Crete Carrier"), Tonn Ostergard, and John and Jane Does 1-10 (collectively, "the Plan Fiduciary Defendants") are fiduciaries of the retirement plan of which Plaintiff and class members have been participants, The Crete Carrier 401(k) Profit Sharing Plan ("the Plan"). As described herein, these Defendants have breached their fiduciary duties to the Plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), to the detriment of the Plan, its participants, and their beneficiaries. The Plan Fiduciary Defendants have failed to monitor the Plan's relationships with service providers prudently, failing to ensure the fees paid for plan services are reasonable. In fact, during the Class Period, the Plan Fiduciary Defendants forced the Plan and its participants to participate in a costly, highly unusual arrangement benefitting Defendant Union Bank & Trust Company, rather than exclusively benefitting the participants. *See infra* ¶ 12. And Defendant Ostergard *has held an ownership interest in Union Bank*, while simultaneously serving as Crete Carrier's CEO, throughout the Class Period.

Despite managing one of the largest ERISA plans of its kind in the country, which should allow the Plan Fiduciary Defendants to leverage market power to obtain superior investments and lower costs, the Plan Fiduciary Defendants turned over recordkeeping and investment responsibility to Defendant Union Bank, which has only two other large plan clients, both smaller than the Plan. The Bank has a grand total of 29 plan clients large enough to even satisfy the 100-participant threshold for reporting to the Department of Labor. Of these, only four have even 1,000 participants, and this includes the Plan, which has over 10,000 (and the Plan pays Union Bank *more*, per-participant, than the other three).[1] And rather than contract for standard recordkeeping and administrative services, under which participants' retirement funds would be invested in market-tested options, the Plan Fiduciary Defendants have set up an unusual arrangement under which Union Bank earns outsized sums investing in individual stocks and bonds, ultimately earning *worse* results for participants, like Plaintiff, than they would enjoy by simply investing in a low-cost S&P 500 fund. All told, the scheme has diverted millions in Plan funds toward Defendant Union Bank throughout the Class Period and caused millions in additional investment harm to participants.

Plaintiff brings this action to remedy this unlawful conduct, recover losses to himself, the Plan, and participants, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

1. Counts One through Five of this Complaint, against the Plan Fiduciary Defendants, challenge their repeated failure to administer the Plan prudently and loyally, their causing the Plan to enter into prohibited transactions including into self-dealing transactions, and their improper monitoring of fiduciaries and service providers to the Plan.

2. Count Six of this Complaint, against Defendant Union Bank in its capacity as fiduciary exercising delegated authority, challenges its failure to monitor some of the largest

[1] The second-largest plan using Union Bank is the Nelnet 401(k) Plan. Nelnet's co-founder and current Executive Chairman of the Board is the son of Union Bank's owner, and the companies maintain close ties. *See* https://nelnetinc.com/history/.

investments in the Plan. Count Seven, against Defendant Union Bank in its capacity as non-fiduciary, challenges this Defendant's knowing participation in fiduciary breaches. Plaintiff also includes in this knowing participation claim Defendant Ostergard, as an alternative claim, in the event he is determined not to be a Plan fiduciary.

3. Plaintiff sues pursuant to ERISA Sections 406, 409, and 502, 29 U.S.C. §§ 1106, 1109, and 1132 and alleges as follows.

4. ERISA imposes a range of strict fiduciary duties in order to safeguard plan participants like Plaintiff. Fiduciaries—like the Plan Fiduciary Defendants—are subject to strict duties of loyalty and prudence. They must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A) and with the "care, skill, prudence, and diligence" expected in managing a plan of similar scope. *Id.* § 1104(a)(1)(B). "Among other things, the duty of loyalty requires the fiduciary to 'deal fairly and honestly with beneficiaries,' so as 'to ensure that a plan receives all funds to which it is entitled.'" *Cunningham v. Cornell Univ.*, 604 U.S. 693, 696 (2025) (citations omitted). These fiduciary duties of loyalty and prudence are among "the highest known to the law." *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

5. In addition, ERISA "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham*, 604 U.S. at 697 (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000)); *see also Harris Tr. & Sav. Bank*, 530 U.S. at 241 (discussing ERISA Section 406(a)(1), 29 U.S.C. § 1106(a)(1)). ERISA's Section 406(a)(1) provides in part that "[a] fiduciary with respect to a plan shall not . . . cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

6. A separate subsection of ERISA's prohibited transactions regime flatly prevents a fiduciary from "'deal[ing] with the assets of the plan in his own interest or for his own account.'"

*Batt v. 3M Co.*, No. 25-CV-3149 (ECT/DTS), 2026 WL 2322559, at *18 (D. Minn. Aug. 11, 2026) (quoting 29 U.S.C. § 1106(b)(1)); *see also id.* ("[V]iolations of [] § 1106(b)(1) generally involve an ERISA fiduciary's use of plan assets for personal profit, gain or advantage.") (quoting *Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 214 (D. Mass. 2002)).

7. Ensuring that ERISA fiduciaries prudently and loyally manage defined contribution ("DC") plans in particular is increasingly important. As of the end of 2023, Americans had approximately $10.6 trillion in such plans—401(k) plans, like the Plan, 403(b) plans, and similar vehicles.[2] While defined benefit ("DB") plans, or traditional pensions, were the predominant retirement vehicle for previous generations, less than a quarter of Generation X, Millennials, and Generation Z retirees are expected to receive any traditional pension income.[3] By contrast, two-thirds of workplaces with retirement plans offer DC plans.[4]

8. At the same time, imprudent and disloyal mismanagement often harms DC plan participants much more than those in DB plans. Employers sponsoring DB plans must stand behind the promised benefit amount and are therefore ultimately responsible for remedying fiduciaries' breaches before participants experience harm: "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). Employers therefore have strong incentives to reduce fees and eliminate underperforming investments. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). In DC plans by contrast, employers do not guarantee any level of benefits, and

---

[2] *See* The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 401(k) Plans, 2021, at 12 (Aug. 2024) (reporting 2023 figures by plan type), *available at* https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[3] *See* Report on Secure Retirement Institute FactBook, *available at* https://401kspecialistmag.com/11-eyebrow-raising-facts-from-the-secure-retirement-institute-chapter-1/. When Congress enacted ERISA, there were more than twice as many DB participants as DC participants. Today, there are almost seven times as many DC participants. Cong. Research Serv., *A Visual Depiction of the Shift from Defined Benefit (DB) to Defined Contribution (DC) Pension Plans in the Private Sector* (Dec. 27, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12007.

[4] Cong. Research Serv., *supra* n.3 at 1.

participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *see also Hughes v. Northwestern Univ.,* 595 U.S. 170, 174 (2022) ("Each participant chooses how to invest her funds, subject to an important limitation: She may choose only from the menu of options selected by the plan administrators . . ."); 29 U.S.C. § 1002(34). Because employers and other fiduciaries bear no risk, they lack the same incentive to police costs and investment performance.

9. The Department of Labor has emphasized that investment options' underperformance and service provider fees can have a pronounced effect on workers' ability to secure their future. For example, a difference of 1% in annual fees can dramatically impact retirement. A worker paying 1.5% instead of 0.5% in fees and earning 7% on an initial $25,000 balance can expect her assets will be nearly *30% lower* after 35 years, adding up to $100,000 less to retire on.[5] The same result occurs if the worker experiences an equivalent difference in investment performance. That worker can expect a lower quality of life in retirement or may be forced to work extra years to make up for the lost opportunity.

10. Despite the high stakes their decisions have on participants' chance for a secure retirement, despite being subject to ERISA's strict fiduciary duties, and despite the serious potential for harm to Plaintiff and other participants, the Plan Fiduciary Defendants failed to employ a prudent and loyal process for managing the Plan.

11. Crete Carrier sponsors ERISA plans for its employees, including the Plan.

12. The Plan Fiduciary Defendants' imprudent and disloyal administration of the Plan has cost participants millions of dollars. In short and as detailed below, Defendants' scheme worked as follows: Defendant Crete Carrier is a long-haul trucking company that, like other such companies, experiences dramatic turnover. Crete Carrier automatically enrolls new drivers and

---

[5] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Aug. 2013), at 2, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

other employees into the Plan, and all such participants are subject to a vesting schedule, under which they are only entitled to their full Plan account if they remain employed for either 3 or 6 years. *See infra* ¶ 48. A large number of drivers do not. The resulting "forfeitures" revert to the Plan as Plan assets, totaling over three quarters of a million dollars per year during the Class Period. The Plan Fiduciary Defendants used these and other Plan assets, including fees charged to accounts of all participants like Plaintiff, to pay Defendant Union Bank over $1,000,000 on average each year in the Class Period, or over $100 per Plan participant. Large plans can expect to pay roughly a third that amount for standard recordkeeping and administrative services, given the competitive marketplace for such services. Participants, like Plaintiff, received such standard services, but also had some of their account segregated to a portion of the Plan investing in individual stocks and bonds, among other investments ("the Managed Account"). Union Bank received its above-average fees, in part, for managing this Account but, on information and belief, its active management led to *worse* results for participants than if they had simply invested in a passive index fund.[6] Union Bank benefited from direct payment for its services, over multiple transactions in the Class Period, and benefited from being able to have over $140 million in additional assets under management. Defendant Ostergard has had an ownership interest in Union Bank during the Class Period, a fact that is not disclosed to Plan participants.

13. Courts have frequently concluded that such conduct is sufficient to state a claim for breach of fiduciary duty and engaging in prohibited transactions. *See, e.g.*, *Braden*, 588 F.3d at 595-96, 600-01*; see also Batt,* 2026 WL 2322559, at **9, 17-19 (applying *Braden* and *Reich v. Constr. Laborers Loc. No. 1140*, 908 F. Supp. 697, 706 (D. Neb. 1995) and denying motion to dismiss prohibited transaction and self-dealing claims arising out of 3M's limiting participants to

---

[6] In addition, several funds offered in connection with Union Bank's standard recordkeeping and investment services ("the Standard Account") were themselves low-performing and/or high-cost investment options, including the MFS Value Fund and the T. Rowe Price Dividend Growth Fund, which historically and consistently underperformed their chosen benchmark. Union Bank owed a fiduciary duty to monitor these investments, and it and all other Defendants failed to act within a reasonable time to address these imprudent investments.

3M-managed investment funds); *see also Hoye v. CHA Gen. Servs., Inc.*, No. CV 23-13238-MJJ, 2025 WL 405081, at *1 (D. Mass. Feb. 5, 2025) (denying motion to dismiss claims involving MFS Value Fund); *Dionicio v. U.S. Bancorp*, No. 23-CV-0026 (PJS/DLM), 2024 WL 1216519, at *4 (D. Minn. Mar. 21, 2024) (denying motion to dismiss claims involving excess recordkeeping fees and collecting cases); *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 912 (9th Cir. 2023) (reversing grant of summary judgment for defendants and concluding that ERISA's prohibited transaction provisions require a fiduciary to consider all compensation that a party-in-interest such as a recordkeeper receives).

14. At all times during the Class Period, the Plan had at least 8,800 participants with account balances at year-end and at least $260 million in assets under management. For 2025, the Plan reported 10,433 participants with account balances at year-end and total invested assets of approximately $392 million.[7] These assets all were, and continue to be, entrusted to the care of the Plan's fiduciaries, including the Plan Fiduciary Defendants.

15. The Plan is one of the largest in the country. Its participant count places it in the top 0.1% of all plans in the country. The Plan's assets rank it among the top 0.2% to 0.5% of all plans nationwide.[8] In fact, based on Forms 5500 filed with the Department of Labor in 2024 (the last full year available), only four plans in the state of Nebraska had more participants. Plans this large have outsized bargaining power in the marketplace for DC plan services and greater control over the fees and expenses charged against participants' investments. *See Pinnell v. Teva Pharms. USA, Inc.*, No. CV 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020). The Plan Fiduciary Defendants could have leveraged this power to ensure that the vast majority of

[7] *See* December 31, 2025 Form 5500 for the Plan, filed with the DOL at 2, 29, 44. The 2025 Form 5500 was filed July 15, 2026 and is the most recent available.

[8] Brightscope/ICI Report, *supra* n.2, at 13 (stating that, out of 641,747 401(k) plans on record with the DOL in 2021, only 844 had 10,000 or more participants and 1,390 had between $250 million and $500 million in assets). The ICI is a leading trade association for the mutual fund industry. *See id.* at 80.

participants paid a fair price for what they received—basic, commoditized recordkeeping services. They did not.

16. Defendants have also failed to satisfy their disclosure requirements. Fee disclosures, which all participants receive, contain no detail about the actual fees participants will pay, let alone Defendant Ostergard's ownership stake in Union Bank. And because the funds in the Managed Account are managed on an ad hoc basis, rather than in an investment vehicle such as a registered mutual fund, the investments are not in a vehicle subject to SEC reporting, are not accompanied by a prospectus or other disclosures, and cannot be tracked by third-party information services such as Morningstar. This disclosure regime has deprived Plan participants of the information necessary to evaluate whether the Plan, and the Managed Account, were being prudently managed.[9]

17. Based on this and other conduct detailed below, Plaintiff asserts claims against the Plan Fiduciary Defendants for breaching their fiduciary duties of prudence and loyalty (Counts One and Three) and for engaging in prohibited transactions (Counts Two and Four). Plaintiff also asserts a claim against Defendant Crete Carrier for its failure to monitor other fiduciaries appointed to manage the Plan (Count Five). Plaintiff asserts a claim against Defendant Union Bank in its capacity as fiduciary for breach of the duty of prudence in connection with its monitoring of investments in the Standard Account (Count Six), and in its capacity as non-fiduciary for knowingly participating in a fiduciary breach (Count Seven), including in that Count a claim in the alternative against Defendant Ostergard, in the event he is not a Plan fiduciary.

[9] ERISA provides participants the right to request additional documentation. Undersigned counsel assisted another Plan participant in submitting a document request pursuant to ERISA Section 104(b), 29 U.S.C. § 1024(b), and similar authority, explicitly requesting contracts with Union Bank, *i.e.,* "contracts . . . under which the plan is . . . operated." Defendants produced some materials, including in response to follow-up requests, but did not produce any such contract.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), because it is an action brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*. Plaintiff brings these Counts pursuant to 29 U.S.C. § 1132(a)(2) and (3), which authorize employee retirement plan participants to bring civil actions on behalf of their plans to remedy fiduciary breaches, prohibited transactions, and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

19. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District. This Court also has personal jurisdiction over Defendants because ERISA provides for nationwide service of process.

20. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the ERISA violations occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

21. Plaintiff Donald Weber resides in Mankato, Minnesota. Plaintiff Weber worked for Crete Carrier from approximately 2015 to approximately 2025. During and after his employment with Crete Carrier, Plaintiff Weber participated in the Plan, investing in the options offered under the Plan, experiencing reduced choice because the underperforming options offered under the Plan limited his options and reduced returns because of Union Bank's conduct, and paying the excessive recordkeeping fees that are part of the subject of this lawsuit. Plaintiff Weber has been financially injured by the unlawful conduct described herein. Plaintiff Weber's

account would have been worth more had all Defendants not violated ERISA as described herein.

22. Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff also has standing to bring suit on behalf of the Plan pursuant to ERISA Section 502(a)(2). 29 U.S.C. § 1132(a)(2); *see also* 29 U.S.C. § 1109; *Fitzpatrick v. Nebraska Methodist Health Sys., Inc.*, No. 8:23CV27, 2023 WL 5105362, at *4–5 (D. Neb. Aug. 9, 2023), *amended on reconsideration*, 2024 WL 361195 (D. Neb. Jan. 31, 2024). Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty, and non-fiduciary Defendants' knowing participation in these breaches, as described herein. Had these Defendants not breached their duty, Plaintiff would have paid lower recordkeeping and administrative fees and enjoyed higher investment returns and the value of his account would correspondingly be higher. Plaintiff also has authority to recover on behalf of the Plan for injuries caused to the Plan by imprudent recordkeeping fees, imprudent monitoring of the Plan's investment options, and participation in prohibited transactions.

23. Plaintiff lacked knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and otherwise engaged in conduct violating ERISA until shortly before he filed suit. These material facts consisted of information such as the investment alternatives that Defendants could have made available within the Plan, the costs and investment performance of existing options compared to potential alternatives that Defendants could have made available, the nature of Defendant Union Bank's ownership and its relationship to Defendants Crete Carrier and Ostergard, the plan costs he experienced and the costs similarly sized plans paid for recordkeeping services of similar quality, as well as information for costs and performance of different types of available investments.

**Defendants**

24. Defendant Crete Carrier is a trucking company headquartered in Lancaster County, Nebraska. Crete Carrier's principal place of business is 400 NW 56th Street, Lincoln, NE 68528. *See* Summary Plan Description—Retirement Plan for Crete Carrier Employees ("SPD") at 19.

25. Defendant Crete Carrier is a private corporation and public information about its ownership is limited. The company's website notes that Duane and Phyllis Acklie purchased the company in 1971. *See* Crete Carrier Corp., Company History, https://cretecarrier.com/company-history/.

26. Defendant Tonn Ostergard serves as Chair and CEO of Crete Carrier. On information and belief, Mr. Ostergard is a son-in-law of Crete Carrier's founders.[10] Mr. Ostergard has also served on the Board of Directors of Defendant Union Bank & Trust Company throughout the Class Period. In a filing submitted to the SEC in connection with Union Bank's work as a municipal advisor, the Bank reported Mr. Ostergard's role as a Director, which apparently began in 2019. The filing listed him as having an ownership interest, reporting a level of at least 5% but less than 10%. *See* Union Bank Form MA, Application for Municipal Advisor Registration, Mar. 26, 2026, *available at* https://www.sec.gov/Archives/edgar/data/1259968/000125996826000001/xslFormMA_X01/primary_doc.xml.

27. Defendant Union Bank is a privately held Nebraska corporation. Farmers & Merchants Investment, Inc., a private bank holding company itself headquartered in Nebraska, owns the majority of Union Bank. *See* Corporate Disclosure Stmt., *In re: MOVEit Customer Data Security Breach Litig.*, No. 1:23-md-03083-ADB (D. Mass.), Docket Entry 540; *see also*

---

[10] *See* Bryan Health, *Journeys* 8-9 (Fall 2018), *available at* https://issuu.com/bryanlgh/docs/fall_2018_journeys_single_pages/8; *see also* Crete Carrier Corp., Company Leadership, https://cretecarrier.com/company-leadership/.

Federal Financial Institutions Examination Council profile of Farmers & Merchants, *at* https://www.ffiec.gov/npw/Institution/Profile/1053580?dt=20120101.

28. Crete Carrier is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). *See* SPD at 18.[11] Crete Carrier is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) because it has the ultimate authority to control and manage the operation and administration of the Plan. Moreover, because Crete Carrier exercises discretionary authority or control with respect to management and administration of the Plan and disposition of the Plan's assets, Crete Carrier is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

29. Crete Carrier also serves as the Plan Administrator for the Plan. SPD at 20.

30. Crete Carrier, as Plan Sponsor and Named Fiduciary, has the power to appoint other fiduciaries of the Plan. For example, in an ERISA 3(38) Fiduciary Investment Management Agreement ("Invstmt. Mgt. Agmt."), effective December 16, 2014 and signed by CEO Ostergard, Crete Carrier delegated to Union Bank fiduciary responsibility for selecting and monitoring the Plan's designated investment options in the Standard Account. *See supra* n.9 (discussing document request). Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31. Defendant Ostergard himself appears to be a fiduciary in exercising discretionary authority or control with respect to management and administration of the Plan and disposition of the Plan's assets. Crete Carrier is a private corporation, owned by the Acklie-Ostergard family, *see supra* ¶ 25, *see also Acklie v. Nebraska Dep't of Revenue*, 313 Neb. 28, 31, 982 N.W.2d 228, 232 (2022) (noting that Acklies maintained an ownership interest in Crete Carrier in early 2010s); Crete Carrier, *Family Owned/Debt-Free*, https://cretecarrier.com/project/family-owned-debt-free/ (marketing video to potential drivers featuring Defendant Ostergard speaking about Crete Carrier's family ownership). As both CEO and, on information and belief, part owner of Crete Carrier, Defendant Ostergard directed Crete Carrier's actions with respect to the Plan.

---

[11] *See also* Plan Form 5500, *supra* n.7, at 1, 33 (Auditor's Report, Note 1).

32. Crete Carrier, acting through its officers, had a fiduciary duty to monitor and supervise any appointed plan fiduciaries. As set forth in detail below, all fiduciaries responsible for the Plan's administration have failed to carry out their duties prudently.

33. For the foregoing reasons, at all times during the Class Period, Crete Carrier was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of plan assets and exercised discretionary authority to appoint and/or monitor the other fiduciaries, which in turn had control over plan management and/or authority or control over management or disposition of the Plan's assets. While Plaintiff has not named other Crete Carrier officers or leadership as Defendants, Plaintiff reserves the right to do so based on information obtained through discovery.

**John Doe Defendants**

34. To the extent that there are additional officers, employees, board members, administrators, and/or contractors of Crete Carrier who are/were fiduciaries of the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, but are not limited to, Crete Carrier officers, employees, board members, administrators, and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## THE PLAN AND ITS ADMINISTRATION

35. The Plan is a defined contribution or individual account plan that includes a cash or deferred arrangement. SPD at 1. It is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering eligible current and former Crete Carrier employees, including Plaintiff when he participated during the Class Period. The Plan is a qualified plan under 26 U.S.C. § 401,

commonly referred to as a "401(k) plan." Plan Form 5500 at 31 (Auditor's Report, Note 1); SPD at 1.

36. The Plan was first effective July 1, 1969. SPD at 18.

37. As with other 401(k) plans, a participant's account in the Plan consists of the sum of her or his contributions and the employer's contributions. *Id.* at 7-8; Plan Form 5500 at 31 (Auditor's Report, Note 1); *see also generally Hughes*, 595 U.S. at 173-74.

38. Unlike many other plans, however, the Plan differentiates participant accounts based on whether the employer contributions are mandatory ("Fixed Matching Contributions") or discretionary ("Nonelective Contributions"), providing different investments and different vesting schedules for each.

39. For either type of contribution-based account, retirement benefits provided by the Plan are based solely on these amounts contributed to participants' accounts, and any income or gains (or losses) on such contributions, less any expense that may be allocated to such participants' accounts. *See* Plan Form 5500 at 31 (Auditor's Report, Note 1).

40. Defendant Union Bank serves as the Plan Trustee and Custodian. *See* SPD at 20; Plan Form 5500 at 31 (Auditor's Report, Note 1).

**<u>Eligibility</u>**

41. The Plan has two entry dates, at the beginning and middle of the plan year. An employee who is 21 or older is eligible to begin participating in the Plan on the first entry date that comes after they have worked for 30 days. SPD at 2; *see also id.* at 1 (listing groups excluded from eligibility, such as "leased employees").

**<u>Contributions and Vesting</u>**

42. Eligible employees are automatically enrolled to contribute 3% of their compensation, with the amount increasing at 1% per year until it reaches 10%, unless they choose a different percentage. SPD at 3.

43. Crete Carrier makes two types of contributions to the Plan on participants' behalf. First, the employer Fixed Matching Contributions equal 10% of a participant's elective deferrals up to 5% of their annual compensation. SPD at 4-5, 8.

44. Second, Employer Nonelective Contributions consist of the participant's share of an additional, annual contribution that the employer may make to the Plan. *Id.* at 4-5.

45. Both types of employer contributions are conditional on factors, such as that the participant be employed on the last day of the Plan Year or have worked a set number of hours of service in the year. *Id.*

46. The Nonelective Contributions include a range of additional factors restricting participation. A worker must have completed 1,000 hours of overall service in a year, and the Plan allocates their share of the overall annual contribution based on a formula awarding 10 points for each year of service and 1 point for each full $200 of compensation earned in the plan year. A worker's share equals the ratio of their points to the total points of all eligible employees. *Id.* at 5.

47. According to the Plan's 2025 Form 5500, employer contributions totaled $358,194. Plan Form 5500 at 29 (Auditor's Report at 5). Like other employers, Crete Carrier enjoys significant benefits from sponsoring the Plan, including tax benefits, recruitment, and retention benefits.

48. Vesting likewise differs depending on the portion of a participant's account attributable to Fixed Matching and Nonelective Contributions. Employees are fully vested in the portion of their account attributable to their own contributions (*i.e.,* they retain the balance even if they terminate employment with Crete Carrier). Employees do not vest in the Fixed Matching Contribution until they have completed three years, at which point they are fully vested. Vesting for Nonelective Contributions takes six years, with employees vesting 20% after 2 years and the amount increasing by 20% each year until the sixth. SPD at 8.

49. If an employee leaves Crete Carrier with any unvested amount in their account, the amount remains in the Plan as a forfeiture. The Plan has used forfeitures for Plan expenses

each year of the Class Period, using $772,107 in 2025, down from $873,214 in 2024. Plan Form 5500 at 32 (Auditor's Report Note 1.)

**The Plan's Investments**

50. Investments available to participants likewise turn on whether the account funds are attributable to Fixed Matching or Nonelective Contributions.

51. Funds from the Fixed Matching Contribution portion are allocated to the Standard Account, *see supra* n.6, through which the Plan allows participants to invest in several mutual funds, including target date funds (funds that in turn invest in a mix of equity and fixed income investments ostensibly balanced based on the investor's time until retirement).

52. The Plan includes 24 options in which participants can invest their contributions or Fixed Matching Contributions. Eleven of these options are Vanguard target date funds. Plan Form 5500 at 40.

53. Pursuant to the 2014 ERISA 3(38) Fiduciary Investment Management Agreement, *see supra* ¶ 30, Union Bank oversees these investments through a delegation from Crete Carrier.

54. Funds from the Nonelective Contribution portion of the Plan are allocated to the Managed Account, *see supra* ¶ 12. As of year-end 2025, funds in the Managed Account were invested in over 150 different options, mostly consisting of individual company stocks (93) and bonds (40), and including mutual funds and government bonds. Plan Form 5500 at 48-53.

55. As alleged below, the Plan Fiduciary Defendants and Defendant Union Bank failed to prudently manage all of the Plan's investment options.

**Payment of Plan Expenses**

56. During the Class Period, certain administrative and investment expenses paid using Plan assets were reported on the Plan's Forms 5500. In 2025, the Plan reported a total of $1,196,798 in Administrative Expenses. Plan Form 5500 at 30 (Auditor's Report at 5). This

amount matched both the amount reported as Recordkeeping Expenses, *id.* at 15, and the amount reported as compensation received by Union Bank, *id.* at 6.[12]

57. The Plan's SPD does not detail how a participant pays these expenses. It notes only that, "The expenses charged to the Plan may be charged pro rata to each Participant in relation to the size of each Participant's account balance or may be charged equally to each Participant." SPD at 7. Likewise, the Plan's 2024 Fee Disclosure, produced in connection with a participant information request, *see supra* n.9, does not list an amount for each participant's share of expenses, listing only the expense ratio for available investments in the Fixed Matching Contribution/Standard Account portion of the Plan.

58. The 2014 ERISA 3(38) Fiduciary Investment Management Agreement provides some additional detail, listing an "Annual Asset-Based Fee" and stating that "if [that Fee] will be paid by the Plan, it will be charged on a pro rata basis to all participants with an account balance under the Plan." Invstmt. Mgt. Agmt. at 2; *see also supra* ¶ 30. It further states that "Union Bank represents and agrees that it will not receive any compensation from any DIA [Designated Investment Alternative] offered under the Plan," but Exhibit A to that contract lists the DIAs then available and includes an explanatory note for "Sub-Transfer Agency or Similar Fees Paid to Union Bank," stating that these are "Part of the Total Expense Ratio." *Id.* at 4.

59. In any case, the Plan's public Forms 5500 support the reasonable conclusion that active participants pay some portion of Union Bank's fees. The 2025 Form's Audit Report breaks out expenses by Participant-Directed (Standard Account) and Non-Participant-Directed Funds (Managed Account), stating that $931,020 of administrative expenses were attributable to the Managed Account, with the remaining $265,778 attributable to the Standard Account. Assuming that the Plan used all forfeitures to pay Union Bank, the total forfeitures ($772,107,

---

[12] The Plan reported that Union Bank also received indirect compensation. In addition, it reported that an entity named Matrix Clearance and Settlement received indirect compensation. The Form 5500 did not list the amount for either entity, only reporting that the service provider gave a formula instead of an amount or estimated amount. Plan Form 5500 at 6.

*see supra* ¶ 49) were insufficient to cover even the administrative expenses attributable to the Managed Account, leaving participants like Plaintiff to pay the balance.

60. Plaintiff Donald Weber participated in the Plan during his employment and, on information and belief, held amounts in both the Fixed Matching and Nonelective Contributions portions.

**ERISA Fiduciary Duties**

61. ERISA imposes strict fiduciary duties, including duties of loyalty and prudence, upon retirement plan fiduciaries like the Defendants here. ERISA Section 404, 29 U.S.C. § 1104(a)(1), provides: "[A] fiduciary shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan." *See also Hughes*, 595 U.S. at 172.

62. The duties of loyalty and prudence "have been described as 'the highest known to the law.'" *Braden*, 588 F.3d at 598 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)); *see also Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019), and Congress "intended that private individuals would play an important role in enforcing ERISA's fiduciary duties." *Braden*, 588 F.3d at 598.

63. ERISA's "prudent person" standard serves "to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418 (2014) (quotation omitted). The Supreme Court has emphasized that this standard imposes a "continuing duty of some kind to monitor investments and remove imprudent ones." *Hughes*, 595 U.S. at 175 (quoting *Tibble*, 575 U.S. at 530). Fiduciaries must exercise prudence in selecting investments and are also subject to a "continuing duty to monitor [plan] investments

and remove imprudent ones," which exists "separate and apart" from the duty with respect to the initial selection. *Tibble*, 575 U.S. at 529. They must dispose of any imprudent investments within a reasonable time and may be held liable either for "assembling an imprudent menu of investment options" or "failing to monitor the plan's investment options to ensure that each option remains prudent." *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

64. A fiduciary must ensure that *each* investment option is and remains prudent, and cannot justify a breach of its duty by arguing that it has offered some prudent investments along with imprudent investments. *Hughes*, 595 U.S. at 176. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

**ERISA Prohibited Transactions**

65. In addition to imposing strict fiduciary duties, ERISA supplements the fiduciary duty of loyalty by prohibiting fiduciaries from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." ERISA Section 406(a)(1)(C); 29 U.S.C. § 1106(a)(1)(C); *see also Batt*, 2026 WL 2322559, at *18.

66. Defendant Union Bank, as the Plan's recordkeeper, is a party in interest by virtue of its providing services to the Plan. *See* 29 U.S.C. § 1002(14)(B); *see also* Plan Form 5500 at 36 (Auditor's Report, Note 5); *Bugielski*, 76 F.4th at 901.

67. Fiduciaries like the Plan Fiduciary Defendants cannot, consistent with Section 406(a)(1)(C), allow plans to contract for services, like recordkeeping and the provision of investments, from service providers like Union Bank unless the transactions satisfy an exemption contained elsewhere in ERISA or an exemption that the Department of Labor has promulgated.

68. Courts addressing service contracts with recordkeepers have held that ERISA's prohibited transaction provisions and statutory exemptions require "a fiduciary [to] consider all compensation—direct and indirect—that the party in interest receives 'in connection with' the services it provides the plan under the contract." *Bugielski*, 76 F.4th at 911 (quoting Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632, 5650, 2012 WL 313892 (Feb. 3, 2012)). Failure to consider *all* compensation that a service provider, such as Union Bank, takes in and to ensure that such compensation is reasonable, constitutes a prohibited transaction and violates ERISA.

69. In a different subsection, (a)(1)(D), ERISA Section 406 also prohibits a plan fiduciary from knowingly entering into a transaction that constitutes a direct or indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

70. Finally, ERISA Section 406(b) prohibits self-dealing by fiduciaries. That subsection provides that a fiduciary may not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). "Courts have found § 1106(b)(1) violations where a defendant 'hires itself to perform work and then sets its own fees.'" *Batt*, 2026 WL 2322559, at *18 (quoting *Perez v. Koresko*, 86 F. Supp. 3d 293, 385 (E.D. Pa. 2015)). Courts have also acknowledged that "Section 1106(b)(1) is written broadly and should be construed broadly." *Id.*

**<u>Liability for a Non-Fiduciary Participating in a Fiduciary Breach</u>**

71. Finally, certain ERISA requirements extend to non-fiduciaries. Section 502 authorizes suits "'to enjoin any act or practice, which violates ERISA,'" and in doing so "extends liability for ERISA violations to certain non-fiduciaries, including for a non-fiduciary's knowing participation in a breach of the fiduciary duties set forth in Section 404." *Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, No. 21 CIV. 8384 (KPF), 2024 WL 2815980, at *5 (S.D.N.Y. May 31, 2024) (quoting 29 U.S.C. § 1132(a)(3)); *see also Harris Trust & Sav. Bank*, 530 U.S. at 249-51.

72. "The well-settled elements of a cause of action for participation in a breach of fiduciary duty are [i] breach by a fiduciary of a duty owed to plaintiff, [ii] defendant's knowing participation in the breach, and [iii] damages." *Carfora*, 2024 WL 2815980, at *5 (quoting *Tr. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 571 (2d Cir. 2016)). To satisfy the second prong, a plaintiff must "allege facts plausibly demonstrating that the nonfiduciary defendant had 'actual or constructive knowledge of the circumstances that rendered the transaction unlawful.'" *Id.* (quoting *Harris Trust & Sav. Bank*, 530 U.S. at 251).

## DEFENDANTS' ERISA VIOLATIONS

73. As described above, the Plan Fiduciary Defendants were fiduciaries of the Plan throughout the Class Period. Defendant Union Bank was a fiduciary, as delegated, with respect to oversight of investment options in the Standard Account.

74. Plaintiff lacked and continues to lack actual knowledge of these Defendants' specific decision-making process for managing the Plan, including their process for selecting and monitoring service providers or Plan investments, as this information is in the sole possession of Defendants.

75. Plaintiff has drawn reasonable inferences regarding these processes from the facts set forth herein for purposes of this Complaint.

### A. Duty of Prudence Violations: The Plan Fiduciary Defendants Caused the Plan to Incur Unreasonable Recordkeeping and Administrative Fees During the Class Period.

#### 1. Defendants Caused the Plan and Its Participants to Pay Union Bank far More than Market Rates for Its Services.

76. Union Bank provides the Plan a set of administrative services, such as tracking participants' account balances, sending participant communications, and providing access to

investments, that collectively are described as "recordkeeping and administrative services." *See generally Hughes*, 595 U.S. at 174.

77. The overall market for recordkeeping and administrative services is highly competitive and commoditized. The market is particularly competitive for typical or core services of "safeguard[ing] 'assets provided by outside service providers,' keep[ing] 'track of participant accounts and transactions,' and provid[ing] 'call centers, websites, account statements[,] and educational materials.'" *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) (describing these as "the suite of administrative services typically provided ... by [a] plan's 'recordkeeper'"). Indeed, one market leader has repeatedly operated this core business at a loss, attempting to make up such losses by pushing participants to its own proprietary investments.[13]

78. The Plan Fiduciary Defendants caused the Plan to pay Union Bank far more in compensation than the market price for plans of comparable size.

79. As background, plan fiduciaries can arrange for recordkeeping to be paid directly by the plan sponsor or from the plan's assets (i.e., from participant accounts). Here, the Forms 5500 state that recordkeeping expenses were paid from the Plan's assets, meaning they were paid from participant accounts and/or forfeitures.

80. In some cases, investment funds will pay some portion of money collected from participants as "expense ratios" – calculated as a percentage of a participant's assets in an investment fund – to recordkeepers to help cover recordkeeping expenses, which is known as "revenue sharing." The recordkeeper, in turn, might pay all or a portion of those revenue sharing

---

[13] Gretchen Morgenson, *To Cover Losses Elsewhere, TIAA Pushes Costly in-house Products on Retirement Savers, Whistleblower Says*, NBC News (Aug. 2, 2024), *available at* https://www.nbcnews.com/investigations/tiaa-pushes-costly-retirement-products-cover-losses-whistleblower-rcna161198. Other recordkeepers have responded to "today's increasingly competitive retirement recordkeeping market" by consolidating, which in turn further drives down costs. *See* Tim Hoying, *The Changing Retirement Recordkeeping Landscape in the US*, Accenture Capital Markets Blog (May 9, 2023), https://capitalmarketsblog.accenture.com/changing-retirement-recordkeeping-landscape-us.

proceeds back to a plan, which can use those proceeds for plan expenses or to credit participant accounts.

81. While courts including the Eighth Circuit have recognized that fiduciaries' use of revenue sharing is not per se imprudent, they have noted that revenue sharing may hide the true scope of fees from participants and even from fiduciaries themselves. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336-37 (8th Cir. 2014).

82. Here, the Plan engaged in revenue sharing, leading to underreporting of the compensation figures on the Plan's Forms 5500 and lack of clarity to participants even beyond the opacity associated with the Managed Account. The Plan's Forms 5500 throughout the Class Period all reported that Union Bank received indirect compensation (potentially revenue sharing from plan investments), but the actual amounts of that indirect compensation are not disclosed. Further, the 3(38) Fiduciary Investment Management Agreement states that "sub-transfer agency or similar fees paid to Union Bank" were "part of the Total Expense Ratio" for different funds. *See* Invstmt. Mgt. Agmt at 4; *but see id.* at 2 (providing that Union Bank represented it would "not receive any compensation from any DIA offered under the Plan").

83. Taking only the reported amounts into consideration, the Plan's recordkeeping and administrative expenses were an average of $102.01 per participant during the Class Period and as high as $117.76.

84. Multiple sources confirm that the market price for recordkeeping and administrative services for similar-sized plans is much lower.

85. For example, data from Forms 5500 filed with the DOL in 2024 shows that plans with participant counts and assets similar to the Plan paid as low as $16.56 per participant, highlighting how much of an outlier Union Bank's fees are. A plan sponsored by Hackensack Meridian Health, with approximately 200 fewer participants than the Plan (measured as participants with account balances at year-end) and with similar assets, paid that amount to a large recordkeeper, less than one-sixth of the fees Plan participants incurred. Two plans by sponsors in the trucking industry, Schneider National and Dayton Freight Lines likewise paid a

fraction of what the Plan paid. The latter had fewer than half the number of participants and less bargaining power, but still paid only $62.60 to Fidelity, half of the fees for the Plan.[14] Each of these examples shows the Plan's fiduciaries could have secured lower rates for core services offered to participants:

| Plan Sponsor | Total Participants (2024) | Assets | Provider | Fees | Per-Participant Fees |
|---|---|---|---|---|---|
| Schneider National, Inc. | 11,356 | $893,375,966 | Principal | $590,250 | $54.47 |
| Premier Health Partners | 11,010 | $243,824,370 | Fidelity | $456,522 | $41.46 |
| ***Crete Carrier*** | ***10,470*** | ***$352,576,388*** | ***Union Bank*** | ***$1,232,912*** | ***$117.76*** |
| Hackensack Meridian Health | 10,545 | $290,304,776 | TIAA | $174,548 | $16.56 |
| Dayton Freight Lines, Inc. | 5,038 | $303,810,435 | Fidelity | $315,368 | $62.60 |

86. Viewed differently, when examining the 114 Forms 5500 filed for plans with between 10,000 and 11,000 active participants listing payments to a service provider, only *three* reported paying more compensation to a service provider, per participant, than the Plan paid to Union Bank. The average per-participant compensation to a service provider was $45.95, even including the Plan and the other outliers. *See also generally Stephan v. Trader Joe's Co.*, No. CV 25-10212-WGY, 2026 WL 2905797, at *21 (D. Mass. Sept. 28, 2026) (discussing competing experts' analyses of recordkeeping expenses during bench trial and noting methodology included looking to Form 5500 data for plans with similar participant counts and assets).

87. Additional sources show that the Plan's recordkeeping and administrative fees were unreasonably excessive. NEPC, a consulting group, recently published the results of a

[14] Source: Schedule C data from Department of Labor Forms 5500 filings.

survey of defined contribution plans, reporting on factors such as the fees plans paid. *See* NEPC, LLC, *NEPC 2023 DC Plan Trends & Fee Survey* (March 2024).[15] The group sampled 240 DC plans, with 2.6 million participants and $259 billion in aggregate assets. The median plan had $626.8 million in assets and 4,729 participants, a participant count well below the Plan's. *See id.* at 4; *see also supra* ¶ 14.

88. NEPC's survey confirmed the principle that larger plans are able to obtain lower recordkeeping fees and showed lower fees across a range of plan sizes. The results found that per-participant fees decreased as plan sizes increased and that half of surveyed plans with between 5,000 and 15,000 participants paid between approximately $37 and approximately $45 per participant. NEPC Report at 14. Given the correlation between size and fees noted in expert testimony from industry professionals, *see infra* n.16 (citing expert report of T. Minnich), and confirmed in the survey itself, it is highly likely that the smaller plans accounted for the bulk of the higher-fee survey responses in this category and that larger plans within the range paid less.

89. As confirmed through the Plan's fee disclosure and contracts, the basic services Union Bank provided with respect to assets invested in the Plan's Standard Account are no more complex than services provided by competing recordkeepers. (That is, the materials do not demonstrate that the Plan's population presents special challenges or that Union Bank's services are of higher quality or otherwise differ materially from those provided by its competitors.) Indeed, the services are less complex for the Plan, which does not offer participant loans or a brokerage window. Further, several services (such as processing Qualified Domestic Relations Orders, *see* 29 U.S.C. § 1056(d)(3)(B)(i)) may even be a profit center for recordkeepers. Recordkeepers will compete to win contracts to provide such services to DC plans, particularly those with many assets and/or large participant populations, like the Plan.

90. The main drivers determining the fees plans pay are the participant count for the plan involved, whether the recordkeeper provided an unusual level of specialized, non-core

---

[15] *Available at* https://www.nepc.com/wp-content/uploads/2024/03/2023-NEPC-DC-Plan-Trends-Fees-Report-Press-Release_Final.pdf.

services, and whether the recordkeeper could anticipate earning ancillary revenue (revenue earned as a result of access to participants, such as revenue from participants rolling over to an IRA or purchasing expensive services from the recordkeeper).[16] In addition, recordkeepers considering the levels of fees to charge look to factors such as the amount of assets in the plan.

**2. The Unusual Services Union Bank Provided to the Plan Do Not Justify the Excessive Fees Defendants Caused the Plan to Pay.**

91. Union Bank did provide additional services, particularly with respect to the Managed Account, including buying and trading individual investments. However, these additional services fall far short of justifying the exorbitant fees Union Bank charged.

92. First, Union Bank charged the Plan and its participants far more for its conduct related to the Managed Account than alternatives in the marketplace. In essence, the Managed Account operated as a proprietary fund (*i.e.,* a fund managed by the Plan sponsor-employer itself)—multiple courts, within and outside the Eighth Circuit, have considered challenges to proprietary fund investments. *E.g., Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018). In any case, such funds charge fees that are at least competitive in the marketplace. *See, e.g.*, *Meiners v. Wells Fargo & Co.*, No. CV 16-3981(DSD/FLN), 2017 WL 2303968, at *3 & n.4 (D. Minn. May 25, 2017) (noting allegations that proprietary fund was more expensive only than two funds in the marketplace).

93. Here, Union Bank effectively charged fees equivalent to expense ratios of 0.5613% and 0.6654% in the years 2025 and 2024,[17] or roughly three times as much as the amount a District Court within the Eighth Circuit found to be excessive for a fund that similarly invested in large cap securities. *Payne v. Hormel Foods Corp.*, No. 24-CV-545 (SRN/DTS),

---

[16] See Expert Report and Rebuttal Report of Ty Minnich, *Sellers v. Trustees of Boston College*, No. 22-cv-10912-WGY (D. Mass.) (D.E. 68-1; 68-6). The report, from an expert with decades of experience in the recordkeeping industry, listed these factors and confirmed that the market is competitive, which has led to declining fees.

[17] That is, calculating the ratio of Union Bank fees attributed to the Managed Account to the total funds invested. *See also supra* ¶ 80.

2024 WL 4228613, at *2 (D. Minn. Sept. 18, 2024) (rejecting motion to dismiss claims that defendants caused plan to overpay for DFA US Large Cap Value Fund, with net expense ratios ranging from 0.22% to 0.27% when less expensive share class was available).

94. If anything, this fact understates the highly unusual and imprudent nature of the Plan's arrangement with Union Bank, and the resulting fiduciary breach. Large plans often use their market leverage to direct participant funds to investment arrangements, like collective investment trusts or separate accounts, because they are *less* costly than mutual funds on the market. Likewise, plan sponsors and other fiduciaries may arrange for affiliated entities to waive recordkeeping and administrative or investment management fees. *E.g., Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 213 (D. Mass. 2020) (reviewing plan sponsor that rebated recordkeeping fees). Finally, even compared to plans offering traditional proprietary funds with no such discounts, Crete Carrier Plan participants including Plaintiff were worse off—rather than being invested in an investment fund subject to "the reporting, governance, and transparency requirements of the Securities Act of 1933, and the Investment Company Act of 1940," *id.* at 211 (citations omitted), their funds were tied up in a bespoke arrangement that provided them no transparency into factors such as risk, suitability, and cost.

95. Viewed differently, another review of Forms 5500 data, *see supra* ¶ 86, shows that 36 plans with over 10,000 active participants showed compensation to a service provider reporting their relation to the plan as Investment Manager, Investment Advisor, or a variation of that description. The average per-participant compensation for these service providers was only $41.59, far less than the difference between Union Bank's fees and the market fees for recordkeeping and administrative services.

96. Second, regardless of whether Union Bank's fees were commensurate with the market, the value it provided with respect to the Managed Account did not justify the cost. On information and belief, participants' holdings in the Managed Account often trailed broad market indices, such as the S&P 500. That is, participants such as Plaintiff incurred a premium cost for

returns worse than they would have enjoyed had their funds simply been invested in a (much lower cost) index fund.

97. Indeed, the Plan's public Forms 5500s show that participants likely would have done better if their funds had simply been invested in the Standard (non-Union Bank managed) Account. Comparing the total investments reported in the Participant-Directed (Standard Account) and Nonparticipant-Directed (Managed Account) portions of the Plan for the class years 2020-2025 shows that the latter grew by 42.3%, far less than the 56.9% growth in the Standard Account. And even that Account itself contained imprudent, underperforming investments, *see infra* ¶ 121, *et seq*. Such a comparison includes factors such as growth from annual contributions, and Plaintiff anticipates obtaining even more precise comparison data through discovery.

**3. Defendants' Use of Forfeitures to Pay Union Bank Does Not Cure the Underlying Fiduciary Breach.**

98. As noted, the Plan used forfeitures to pay Plan expenses throughout the Class Period. As also noted, the Plan's administrative expenses appeared to be exclusively fees paid to Union Bank. The bulk of Union Bank's fees therefore appeared to be paid through reclamation of funds represented to drivers and other employees as deferred compensation:

| Year | Total Compensation to Union Bank | Forfeitures Used for Plan Expenses |
|---|---|---|
| 2025 | $1,196,798<br>*[$931,020 allocated to Managed Account*] | $772,107 |
| 2024 | $1,232,912<br>*[$1,029,525 to Managed Account]* | $873,214 |
| 2023 | $1,077,186<br>*[$915,471 to Managed Account]* | $850,318 |
| 2022 | $778,989<br>*[$702,780 to Managed Account]* | $681,748 |
| 2021 | $915,900<br>*[$812,684 to Managed Account]* | $791,657 |
| 2020 | $896,445<br>*[$831,238 to Managed Account]* | $795,390 |
| 2019 | $778,806<br>*[$755,848 to Managed Account]* | $604,072 |

This constitutes an improper use of forfeitures. Not only does the payment to Union Bank (and ultimately to Defendant Ostergard) violate the Plan Fiduciary Defendants' duty of loyalty, it obscures the impact of the Plan's fees from participants, as neither the fee disclosures nor participants' statements advise them of this effect.

99. The source of these forfeitures is itself problematic. Many drivers worked an insufficient time to vest fully in their retirement account, an experience that is typical in the trucking industry overall and at Crete Carrier.

100. Turnover among large trucking firms is endemic, reaching rates in the high double digits and sometimes even triple digits. Recent studies have shown turnover rates in the industry of 91%—meaning that nine out of ten new hires will leave within a short timeframe—and some firms experience turnover rates over 100%, requiring them to hire even more drivers.[18]

101. Data from the Plan itself indicates that Crete Carrier experienced high turnover. The Plan's 2024 Form 5500 reports that 1,048 participants terminated employment during the plan year with accrued benefits that were less than 100% vested. Crete Carrier Corp. 401(k) Profit Sharing Plan 2024 Form 5500 at 2. Compared to the total of 10,470 participants with account balances at the end of that year, this figure showed a turnover rate of approximately 10.01% that year. Data for the 121 plans filing 5500s in 2024 with total participant counts between 9,500 and 10,500 showed an average rate of 3.06%. If anything, this figure understates how dramatic Crete Carrier's number is, as it likely includes plan sponsors with mass layoffs, mergers, and other corporate events. Individual companies' data is even more illustrative. For

---

[18] Robin Kaiser-Schatzlein, Opinion, *How Life As A Trucker Devolved Into a Dystopian Nightmare*, N.Y. Times (Mar. 15, 2022), *available at* https://www.nytimes.com/2022/03/15/opinion/truckers-surveillance.html ("For decades, truckers have quit at alarming rates, leading to a chronic shortage. The turnover rate was at a staggering 91 percent in 2019, which means that for every 100 people who signed up to drive, 91 walked out the door.") (citing Journal of Commerce Data); *Montoya v. CRST Expedited, Inc.*, 404 F. Supp. 3d 364, 373 (D. Mass. 2019), *aff'd*, 88 F.4th 309 (1st Cir. 2023) ("CRST also has a high employee turnover rate of approximately 160% per year, i.e., for every one hundred truck driving jobs CRST needs to fill each year, it must hire one hundred and sixty drivers.").

example, the 2024 figure for Wal-Mart's 401(k) Plan (the largest by participant count) was 0.0107%, while the figure for Wells Fargo was 0.57%.

102. The Plan's relationship with Union Bank harmed each of these participants, who would have been able to take more of their funds with them if the Plan Fiduciary Defendants had negotiated a more prudent, traditional arrangement with lower costs and better performing investments.

103. Of note, the company's high turnover only magnifies the benefit of the Plan to Crete Carrier. *See supra* ¶ 47. Indeed, the company's promotional materials tout the Plan to entice drivers to sign on.

104. Termination and turnover data only tells part of the story, however, because the vesting schedule and allocation formula for the Nonelective Contribution weighed heavily in favor of long-term Crete Carrier employees, particularly company insiders. Not only did workers earn a larger share based on their tenure, but they also had the deck stacked against them if they earned less than other workers. *See supra* ¶ 46.

105. In addition, participants received minimal if any benefits from non-core services Union Bank provided for assets in the Fixed Matching Contribution portion of the Plan. Somewhat unusually, Crete Carrier as sponsor delegated oversight of investments to Union Bank and presumably paid additional compensation to it. In most plans, the sponsor undertakes such oversight at no charge to participants.

106. Defendants could have made a range of alternate choices to ensure that the funds paid as deferred compensation to shorter-tenured employees (primarily drivers) were used to benefit them and all employees. For example, many plans insist on a revenue credit arrangement with their recordkeepers, limiting their compensation to a set amount and requiring that any excess be returned directly to participants. Defendants could pair such an arrangement with a contract that requires Union Bank's fees to be paid based on the services received—that is, in proportion to the amount invested in either portion of the Plan rather than, as it appears, pro rata based on total account balance. *See supra* ¶¶ 57, 58. Under the existing arrangement, participants

who contribute their own funds and may not even qualify for a Nonelective Contribution and/or never meaningfully vest in the latter bear a disproportionate amount of the fees. Finally, and significantly, Defendants could have contracted with a more established recordkeeper separately to provide core services and/or contracted with a recordkeeper for the entire Plan that did not receive the outsized compensation Union Bank did.

107. In any case, the Plan Fiduciary Defendants' allocation of forfeitures to Union Bank still left participants paying some recordkeeping and administrative fees, and exposed them to the underperformance of the Managed Account.

**4. The Plan Fiduciary Defendants Failed to Take Action to Ensure Prudent Fees.**

108. To satisfy their duty of prudence, fiduciaries must evaluate all fees participants pay to a recordkeeper or other service provider on a continuing basis. *See* Dep't of Labor, *A Look at 401(k) Plan Fees*, *supra* n.5, at 2; *see also Bugielski*, 76 F.4th at 912 ("[T]he duty of prudence requires a fiduciary to discharge his or her duties 'solely in the interest of [plan] participants and beneficiaries' and for the purpose of 'defraying reasonable expenses of administering' the plan. *A fiduciary cannot do so, however, if he or she is unaware of how and to what extent a service provider is compensated.*") (citation omitted) (emphasis added). This requires an evaluation of every fee a service provider receives, whether through direct compensation, revenue sharing, expense ratios, or other revenue, and a prudent fiduciary should ensure any payments exceeding reasonable compensation are returned to the Plan. Here, as noted, the Plan's Forms 5500 report that Union Bank received indirect revenue as well, without providing details.

109. Apart from indirect revenue from items such as revenue sharing, recordkeepers also earn ancillary revenue as a result of their relationships with plans. Report, *supra* n.16, at 15-16. This can come in the form of revenue from participants rolling over funds to Individual Retirement Accounts, *see id.*, or participants purchasing services such as investment advice or investment management and selecting proprietary funds from the recordkeeper's affiliates.

110. Some plans have barred recordkeepers entirely from earning ancillary revenue of this kind. *See, e.g., Vellali v. Yale Univ.*, No. 3:16-CV-1345(AWT), 2022 WL 13684612, at *12-13 (D. Conn. Oct. 21, 2022) (noting that plan acted to limit similar practices by TIAA in 2016).

111. The information available to Plaintiff contains no indication that the Plan Fiduciary Defendants made themselves aware of the possibility of ancillary revenue. To the contrary, the fact that Defendants appear to have taken no action to replace Union Bank in over a decade indicates that Defendants took no action to restrict Union Bank's earning ancillary revenue or to require that it reduce its asset-based fees.

112. Prudent fiduciaries not only ensure they are aware of the compensation service providers receive but also look externally, to the marketplace, to determine what comparable plans are paying their service providers. This information, consequently, helps determine what is reasonable compensation. Courts have held that this may require conducting a Request for Proposal process, issuing RFPs every three to five years as a matter of course or more often if benchmarking or other information shows the fees are unreasonable. *See Stephan*, 2026 WL 2905797, at *5; *Brookins v. Northeastern Univ.,* No. 22-cv-11053-NMG, 2024 WL 1659507, at *3 (D. Mass. Apr. 17, 2024); *Sellers v. Trs. of Bos. Coll.,,* 647 F. Supp. 3d 14, 26 (D. Mass. 2022) (collecting cases); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *see also Tracey v. Mass. Inst. of Tech.,* No. CV 16-11620-NMG, 2017 WL 4478239, at *3 (D. Mass. Oct. 4, 2017) ("As part of the 'prudent man standard' one would expect a fiduciary to obtain bids at some point[.]"). Obtaining market information is particularly important since fees in the retirement plan marketplace regularly show a downward trend. *See* Brightscope/ICI Report, *supra* n.2, at 39; Articles, *supra* n.13.

113. Both ERISA and DOL regulations "require[] plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of

the plan's participants and beneficiaries." DOL 408(b)(2) Regulation Fact Sheet[19] at 1. In guidance to fiduciaries, the DOL has emphasized that staying informed about the marketplace is a key component of prudent conduct:

> "Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."
>
> *Id.* (emphasis added).

114. The facts available to Plaintiff—including that the Plan has retained the same recordkeeper over the course of the Class Period and before, as far back as 2012, and that the fees paid are excessive—support an inference that Defendants failed to conduct RFPs at reasonable periods and otherwise failed adequately to explore whether the Plan could obtain more favorable rates in the recordkeeping marketplace, which is highly competitive and includes many firms capable of offering the same levels of service.

115. In light of the Plan's asset size and participant count, the trend toward lower recordkeeping expenses and the competitive nature of the marketplace, and evidence that comparable plans paid much less for the same services, the Plan could have obtained recordkeeping services of the same or better quality at a lower cost.

### B. Duty of Prudence: Defendants Failed To Act Meaningfully to Monitor Investments, Limiting Participants to Imprudent Investment Options.

116. Defendants also failed to ensure that Union Bank prudently selected and monitored the Plan's investment options for the Standard Account during the Class Period. Defendants' inaction exposed the Plan's participants to underperforming and excessively costly

---

[19] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/factsheets/final-regulation-service-provider-disclosures-under-408b2.pdf.

investments, wasting the Plan's assets and harming each participant's ability to obtain a secure retirement through prudent investment options.

117. The Plan Fiduciary Defendants should have been aware of the flaws in some of the Plan's most popular options based on the options' performance, return, and cost data, but their failure to act within a reasonable time supports an inference that Defendants acted imprudently. Similar failures have been flagged in prior litigation, including within the Eighth Circuit. The issues identified in those cases have persisted into the Class Period and to the present day.

118. In comparison to options in similarly sized plans, some of the Plan's investments were more expensive and returned less than comparable options.

119. Each fund in the Plan has an associated expense ratio, reflecting the fee charged for investment management and other services. *See also supra* ¶ 80. The expense ratio is based on a percentage of assets and is determined in the sole discretion of an investment option's managers. An expense ratio of 0.5% means a participant will pay $5.00 annually for every $1,000 in assets invested in that fund. *See generally Brookins*, 2024 WL 1659507, at *1. The expense will then reduce the participant's return and the compounding effect of that return, as outlined in the DOL's "A Look at 401(k) Plan Fees" guidance. *Supra* n.5. This effect increases the importance of having prudent fiduciaries monitoring investment fees and net performance.

120. As noted above, Defendants delegated their responsibility for monitoring the various investment options made available to participants in the Standard Account. The Plan's Forms 5500 list the options, which as of December 31, 2025 totaled 24. A participant who enrolls in the plan, including those automatically enrolled, and who does not specify an investment allocation will have contributions invested in one of the age-based, target date funds. *See* supra ¶ 51; Invstmt. Mgt. Agmt., *supra* ¶ 30.

121. The Plan has included a stable value fund during the Class Period that returns less than similar options, failed to act as to the MFS Value Fund, whose performance failed to justify

its expense, and even added an imprudent option, the T. Rowe Price Dividend Growth Fund, whose performance likewise failed to justify its expense.

122. These options, combined, contain millions of participants' assets:

| **Option Name** | **2025 Assets** |
|---|---|
| Reliance MetLife Stable Value | $9,406,468 |
| MFS Value Fund Cl R6 #4810 | $16,909,811 |
| T. Rowe Price Dividend Growth Fund-I | $695,576 |

In total, these assets represent approximately 14% of the total assets in the Standard Account.

123. The Reliance MetLife Stable Value Fund's imprudence is clear from the rate of return participants experienced. The Plan's year-end 2024 fee disclosure reports the following annual average returns for that Fund:

| **Average Annual Returns as of 12/31/2024** | **1 yr.** | **5 yr.** | **10 yr./Since Inception** |
|---|---|---|---|
| ***Reliance MetLife Series 25053 (o)*** | 2.92% | 2.53% | 2.58% |

The Disclosure also notes that the investment has a total annual operating expense of 0.52%, or $5.20 per $1,000.

124. Defendants and Union Bank should have been aware that higher returns and better terms were available for a materially identical investment. In *Payne v. Hormel Foods Corp.*, *supra*, the District of Minnesota both analyzed a similar investment and showed how claims related to that investment fit the Eighth Circuit's framework announced in *Matousek*. There, the crediting rates for the plan's stable value funds were even higher than the Plan's here—from 2017 to 2023, that plan's crediting rate ranged from 3.00% to 3.20%.

125. Precisely the same types of comparators as in *Payne* support an inference of imprudence as to the Reliance MetLife stable value fund. For example, TIAA traditional annuity rates offered between 2024 and 2025 were up to twice as high, ranging from 4.25% to 5.25% for new contributions, depending on the type of contract. See *TIAA* Traditional Annuity interest

crediting and income payout rates. Archived pdf *available at* https://web.archive.org/web/20241106140516/https://www.tiaa.org/public/pdf/t/tiaa-traditional-rates-advisor.pdf; *compare Payne*, 2024 WL 4228613, at *2 (reporting that TIAA rates from 2017 through 2023 ranged from 4.25% to 7.00%). Further, while the MassMutual plan option that the *Payne* court found potentially imprudent was itself higher than the Plan's rates, MassMutual offered a similar alternative with rates ranging from 3.81% to 4.68% between 2017 and 2023, or at minimum nearly a full percentage point higher than the Plan's 2.92% rate at the end of 2024. *See id.* (reporting rates for MassMutual separate account Guaranteed Investment Contracts).

126. The MFS Value Fund's and T. Rowe Price Dividend Growth Fund's imprudence is as easily shown, again based on the Plan's own fee disclosures. The year-end 2024 fee disclosure notes that the benchmark for each fund is the S&P 500 and also shows that the two funds dramatically underperformed their benchmark for *all* periods:

| **Average Annual Returns as of 12/31/2024** | **1 yr.** | **5 yr.** | **10 yr./Since Inception** |
|---|---|---|---|
| **MFS Value Fund** | 12.02% | 8.34% | 8.92% |
| **T. Rowe Price Dividend Growth Fund** | 13.65% | 10.85% | 11.51% |
| ***Benchmark (S&P 500)*** | 25.02% | 14.53% | 13.10% |

127. For each period selected by Defendants, the funds in the Plan failed to match the benchmark, also chosen by Defendants. And the differences were not small—the benchmark returned nearly twice as much as each option in the one-year period.

128. Given these funds' clear and continuing underperformance, the Plan's fiduciaries should have found more prudent alternatives and replaced the MFS Value Fund during the Class Period. For the T. Rowe Price Dividend Growth Fund, the Plan's fiduciaries actually *added* the imprudent fund during the Class Period.

129. The marketplace offers a range of alternatives for either fund. The Plan's fiduciaries could have opted for any one of a number of funds that attempt to track or beat the S&P 500, including exchange traded funds. Since such funds replicate the very index the Plan's fiduciaries selected, they constitute a meaningful benchmark for comparison. And since such funds track the returns of the S&P 500, the Plan's existing investments have underperformed those funds in the periods outlined above.

130. Defendants' failure to take timely action had a profound impact on Plan participants. As noted, nearly a sixth of the Plan's assets were invested in these options. They clearly merited close scrutiny.

131. Had Defendants prudently monitored the investments within the Plan, Defendants would have taken action as to the Reliance MetLife Stable Value Fund, the MFS Value Fund and other funds, and would not have added the T. Rowe Price Dividend Growth Fund in favor of prudent options. Such actions could have taken the form of removing, freezing, replacing, or renegotiating the terms of these options. *See Hughes*, 595 U.S. at 176 ("If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty.")

**C. <u>Duty of Loyalty and Prohibited Transactions: Defendants Used Plan Assets for the Benefit of Defendants Union Bank and Ostergard Rather than for Plan Participants' Exclusive Benefit.</u>**

132. Union Bank was a service provider to the Plan and, accordingly, a party-in-interest.

133. The Plan engaged in a series of transactions with Union Bank throughout the Class Period, purchasing services such as traditional recordkeeping and administrative services as well as investment oversight and paying Union Bank in return. Union Bank's compensation came from Plan Assets.

134. Union Bank enjoyed a range of benefits from the Plan's unusual service provider arrangements. Primarily, it received direct revenue from the excessive and imprudent fees

charged to the Plan and its participants. Union Bank also enjoyed access to additional funds under direct management, allowing the Bank to market its services to other clients and train personnel, among other benefits.

135. The Plan Fiduciary Defendants caused the Plan to enter into each of the transactions with Union Bank.

136. The Plan Fiduciary Defendants knew that the transactions used Plan assets and knew the benefits they conferred on Union Bank.

137. The Plan Fiduciary Defendants also knew that the transactions were not for the exclusive benefit of Plan participants, given the superior alternatives available, including market options for recordkeeping and administrative services and investment options, such as separate accounts, collective trusts, or mutual funds, more traditional than the Managed Account.

**D. Duty of Loyalty and Prohibited Transactions: Defendants Engaged in Self-Dealing.**

138. Defendants Ostergard, Crete Carrier, and Union Bank were fiduciaries of the Plan during the Class Period.

139. On information and belief, Defendant Ostergard participated in hiring Union Bank to perform work for the Plan. *See, e.g.*, *supra* ¶ 30. He did so despite the fact that he owned between 5 and 10% of the Bank during the Class Period. *See supra* ¶ 26. Put differently, as the Plan was paying Union Bank approximately $1,000,000 each year, a portion of that amount was effectively being returned to Defendant Ostergard.

140. Plaintiff anticipates that additional discovery will show that Crete Carrier, as a private, family-owned company, likewise benefited from the Plan's relationship with Union Bank. These Defendants' conduct constitutes "ERISA fiduciar[ies'] use of plan assets for personal profit, gain or advantage," and a defendant "hir[ing] itself to perform work and then set[ting] its own fee," which violates ERISA's duty of loyalty. *Batt*, 2026 WL 2322559, at *18. They also constitute a violation of ERISA's prohibited transaction provisions in Section 406(a)(1)(D). *See id.* at *19 (listing elements of prohibited transaction claims as including (1) that service provider was a fiduciary with respect to the plan and was selected by other

fiduciaries; (2) in role as service provider, entity received compensation; (3) that compensation came from plan assets).

141. To the extent Defendant Union Bank, through delegation of fiduciary duty, had a role in selecting itself to receive Plan funds, the Bank likewise engaged in unlawful self-dealing.

**E. <u>Knowing Participation in Fiduciary Breaches.</u>**

142. Insofar as Defendants Union Bank and Ostergard did not act in a fiduciary capacity, they had full knowledge of the Plan's fiduciaries' breaches, participated in these breaches, and are liable as non-fiduciaries.

143. Defendants knew all of the facts underlying both the imprudence of the Plan's arrangements with Union Bank—that is, they knew of the fees charged to the Plan and its participants as well as the value of services rendered—and the disloyal and self-dealing nature of the arrangements. Defendant Ostergard was both CEO of Crete Carrier and a Director of Union Bank. He and other personnel in the organizations knew all of the facts underlying the fiduciary breaches described above.

144. Both Defendants also affirmatively assisted the underlying breaches and enabled the breaches to proceed, by effectuating the underlying agreements and helping to conceal the breaches from the Plan participants whose retirement security they put at risk.

## CLASS ACTION ALLEGATIONS

145. Plaintiff brings causes of action as a class action on behalf of himself and all others similarly situated. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) allows participants to bring actions on behalf of a plan. Plaintiff seeks certification pursuant to that provision and pursuant to Federal Rule of Civil Procedure 23(a) and (b). The putative Class that Plaintiff seeks to represent is defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in, or beneficiaries of the Crete Carrier 401(k) Profit Sharing Plan at any time from November 12, 2020 through the date of judgment (the "Class Period").[20]

---

[20] Plaintiff reserves the right to propose different or additional classes or subclasses in any motion for class certification or subsequent pleadings.

146. Numerosity: The members of the Putative Class are so numerous that joinder of all members is impracticable. As of December 31, 2025, the Plan had 10,433 "participants with account balances as of the end of the plan year." Plan Form 5500 at 2. To require individual actions would prejudice putative Class Members and Defendants. The identities of the putative Class Members, and the details of their retirement plan accounts, will be determined from Defendants' records.

147. Typicality: Plaintiff's claims are typical of those of other members of the Putative Class. Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement, like other Class members. Defendants treated Plaintiff and other Class members consistently and managed the Plan jointly and uniformly as to all Participants. Plaintiff's claims arise out of the same conduct and misconduct by Defendants, as alleged herein, that form the basis of Class members' claims. Defendants' wrongful conduct has affected all members of the Class similarly. Plaintiff's claims are thereby representative of and co-extensive with the claims of the Class.

148. Commonality: There are questions of law and fact common to Plaintiff and putative Class Members that predominate over any questions affecting only individual members of the putative Class. These common questions of law and fact include, but are not limited to:

a) Whether Defendants are and/or were fiduciaries of the Plan;
b) Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;
c) Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;
d) Whether non-fiduciary Defendants are liable for knowing participation in fiduciary breaches;
e) The proper form of equitable and injunctive relief; and
f) The proper measure of monetary relief.

149. Adequacy of Representation: Plaintiff has no conflicts of interest with other Class Members, will fairly and adequately represent the Class, and will prosecute the case vigorously on behalf of the Class. Counsel representing Plaintiff are competent and experienced in litigating complex cases and large class actions, including ERISA and other employment law cases.

150. Superiority of Class Action: Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Putative Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests. An award of equitable relief, such as removal of fiduciaries, would apply to all participants in the Plan and would thus be dispositive of their interests.

151. In the alternative, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

152. Finally, certification is warranted under Rule 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' misconduct applied uniformly to all Class members, who individually do not have an interest in pursuing separate actions. The amount of each individual's recovery is relatively small compared to the burden of individual prosecution. Certification will also obviate the need for duplicative litigation that might render inconsistent judgments, and management of this action as a class action will not present likely difficulties.

153. If each individual Member of the Putative Class were required to file an individual lawsuit, Defendants would necessarily gain an unfair advantage because Defendants would be able

to exploit and overwhelm the limited resources of each Class Member with Defendants' vastly superior and financial legal resources.

154. Requiring each individual Member of the Putative Class to pursue an individual remedy would also discourage the assertion of lawful claims by those Class Members, particularly by those still employed by Crete Carrier, who would be disinclined to pursue these claims against Defendants because of an appreciable and justifiable fear of retaliation and permanent damage to their careers and well-being.

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty of Prudence in Violation of ERISA (29 U.S.C. § 1104(a)(1)(B))**

**(Against Defendants Crete Carrier, Ostergard, and Does 1-10)**

155. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

156. As alleged above, Defendants Crete Carrier, Ostergard, and Does 1-10 are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

157. ERISA Section 404, 29 U.S.C. § 1104, imposes fiduciary duties of prudence upon the Plan Fiduciary Defendants in connection with the administration of the Plan, the selection and monitoring of Plan investments, and the monitoring of service providers to the Plan.

158. The Plan Fiduciary Defendants' fiduciary responsibilities include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with appropriate care, skill, diligence, and prudence. Finally, these Defendants are obligated to ensure that the Plan's fees are reasonable and that the Plan's service providers, including Union Bank, appropriately select and retain prudent investment options, evaluate and monitor the Plan's investments on an ongoing basis and eliminate imprudent ones, and take all necessary steps to ensure that the Plan's assets are invested prudently.

159. As detailed above, the Plan Fiduciary Defendants failed to prudently and objectively monitor the Plan's relationship with Union Bank. Defendants failed to investigate

whether Union Bank timely removed underperforming and costly funds and failed to investigate alternatives to Union Bank as recordkeeper.

160. Each of the actions and omissions described in Paragraph 159 above and elsewhere in this Complaint demonstrates that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

161. The Plan and its participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches.

162. Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, the Plan Fiduciary Defendants are liable to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendants made through use of Plan assets, and to restore to the Plan any profits resulting from their breaches of fiduciary duties.

163. Each Defendant knowingly participated in each breach of the other Defendants, with knowledge that such acts were a breach, and enabled other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties. Each Defendant knew of the other Defendants' breaches and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Under ERISA Section 405, 29 U.S.C. § 1105(a), each Defendant is therefore also liable for the losses caused by the breaches of their co-fiduciaries.

164. Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

## SECOND CAUSE OF ACTION

### Prohibited Transactions in Violation of ERISA (29 U.S.C. § 1106(a)(1)(C))

### (Against Defendants Crete Carrier, Ostergard, and Does 1-10)

165. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

166. As alleged above, Defendants Crete Carrier, Ostergard, and Does 1-10 are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

167. ERISA Section 406, 29 U.S.C. § 1106, prohibits certain transactions deemed "likely to injure" plans such as the Plan. *Cunningham*, 604 U.S. at 697; *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 25 (1st Cir. 2018). One such prohibited transaction provides that fiduciaries, such as Defendants, may not "cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

168. Pursuant to Section 406(a)(1)(C), fiduciaries must consider all sources of compensation that a service provider receives and ensure that such compensation is reasonable; if not, the transaction constitutes a furnishing of services prohibited by ERISA. *See Bugielski*, 76 F.4th at 910-11.

169. As detailed above, the Plan Fiduciary Defendants failed to ensure that the transactions between the Plan and Union Bank, wherein the Plan paid Union Bank hundreds of thousands per year pursuant to a service provider contract, satisfied ERISA Section 406. The Plan Fiduciary Defendants failed to investigate *all* sources of compensation that Union Bank received—including direct fees for recordkeeping, revenue sharing and other income from investment funds, and ancillary revenue—and to ensure that such compensation was reasonable. These Defendants' failure violates Section 406.

170. Each of the actions and omissions described in Paragraph 169 above and elsewhere in this Complaint demonstrates that Defendants caused the Plan to participate in transactions with a party-in-interest in violation of Section 406.

171. While Section 406 imposes a per se ban and does not require a showing of harm to prove a violation, *see Cunningham*, 604 U.S. at 700; *Bugielski*, 76 F.4th at 900, Defendants' prohibited transactions resulted in the Plan and its participants suffering millions of dollars in losses.

172. Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to make good to the Plan all losses resulting from the aforementioned prohibited transactions. *See Harris Trust & Sav. Bank*, 530 U.S. at 241.

173. Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

**THIRD CAUSE OF ACTION**

**Breach of Fiduciary Duty of Loyalty in Violation of ERISA (29 U.S.C. § 1104(a)(1)(A))**

**(Against Defendants Crete Carrier, Ostergard, and Does 1-10)**

174. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

175. As alleged above, Crete Carrier, Ostergard, and Does 1-10 are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

176. ERISA Section 404, 29 U.S.C. § 1104, imposes fiduciary duties of loyalty upon the Plan Fiduciary Defendants in connection with the administration of the Plan and the selection and monitoring of service providers to the Plan.

177. The Plan Fiduciary Defendants' fiduciary responsibilities include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with appropriate care, skill, diligence, and prudence.

178. As detailed above, the Plan Fiduciary Defendants failed to investigate alternatives to Union Bank as recordkeeper and failed to investigate alternative arrangements with Union Bank, despite knowing of Defendant Ostergard's interest in Union Bank.

179. Each of the actions and omissions described in Paragraph 178 above and elsewhere in this Complaint demonstrates that Defendants failed to act "solely in the interest of the [Plan's] participants and beneficiaries," in violation of ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

180. The Plan and its participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches.

181. Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, the Plan Fiduciary Defendants are liable to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendants made through use of Plan assets, and to restore to the Plan any profits resulting from their breaches of fiduciary duties.

182. Each Defendant knowingly participated in each breach of the other Defendants, with knowledge that such acts were a breach, and enabled other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties. Each Defendant knew of the other Defendants' breaches and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Under ERISA Section 405, 29 U.S.C. § 1105(a), each Defendant is therefore also liable for the losses caused by the breaches of their co-fiduciaries.

183. Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

## FOURTH CAUSE OF ACTION

## Prohibited Transactions in Violation of ERISA (29 U.S.C. § 1106(a)(1)(D))

## (Against Defendants Crete Carrier and Ostergard)

184. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

185. As alleged above, the Plan Fiduciary Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

186. ERISA Section 406, 29 U.S.C. § 1106, prohibits certain transactions deemed "likely to injure" plans such as the Plan. *Brotherston*, 907 F.3d at 25. One such prohibited transaction provides that fiduciaries, such as these Defendants, may not "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

187. As detailed above: (1) Union Bank was a fiduciary with respect to the Plan and was selected by other fiduciaries, namely the Plan Fiduciary Defendants; (2) in its role as a service provider to the Plan, Union Bank received compensation; and (3) that compensation came from Plan assets. *See Batt*, 2026 WL 2322559, at *19 (citing 29 U.S.C. § 1106(a)(1)(D)).

188. Each of the actions and omissions described in Paragraph 187 above and elsewhere in this Complaint demonstrates that Defendants caused the Plan to participate in prohibited transactions.

189. While Section 406 imposes a per se ban and does not require a showing of harm to prove a violation, *see Cunningham*, 604 U.S. at 700*; Bugielski*, 76 F.4th at 900, Defendants' prohibited transactions resulted in the Plan and its participants suffering millions of dollars in losses.

190. Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, the Plan Fiduciary Defendants are liable to make good to the Plan all losses resulting from the aforementioned prohibited transactions. *See Harris Trust & Sav. Bank*, 530 U.S. at 241.

191. Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

## FIFTH CAUSE OF ACTION

## Failure to Monitor Fiduciaries

## (Against Defendant Crete Carrier)

192. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

193. Defendant Crete Carrier is a fiduciary of the Plan with responsibilities relating to the selection and monitoring of the Plan's investment options.

194. Crete Carrier is responsible for appointing and removing administrators and individuals charged with administration and oversight of the Plan. Crete Carrier therefore has a fiduciary responsibility to monitor the performance of all other fiduciaries. Crete Carrier has delegated to Union Bank responsibility for monitoring investments available to participants, including Plaintiff.

195. ERISA requires monitoring fiduciaries to ensure that the fiduciaries they monitor in turn satisfy their fiduciary obligations. These obligations include those with respect to investment selections, monitoring of service providers, and compliance with plan documents. Monitoring fiduciaries are required to act promptly to protect plans, participants, and beneficiaries when monitored fiduciaries breach their own obligations.

196. Crete Carrier breached its fiduciary monitoring duties in numerous ways, including:

a) failing to monitor and evaluate the performance of individuals appointed to monitor and administer the Plan and failing to have a system in place for doing so. Crete Carrier did nothing as the Plan suffered significant losses as a result of imprudent actions and omissions;

b) failing to monitor the processes by which those responsible, including Defendant Union Bank, selected and monitored Plan investments. The monitored fiduciaries' actions and inactions would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

c) failing to remove administrators whose performance was inadequate as demonstrated by their retaining imprudent, excessively costly, and poorly performing investments within the Plan and failing properly to monitor recordkeeping fees to the detriment of the Plan and plan participants' retirement savings.

197. Due to these foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

198. ERISA Sections 409 and 502, 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), render Crete Carrier liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries.

199. Wherefore, Plaintiff and putative Class Members request relief as hereinafter provided.

## SIXTH CAUSE OF ACTION

## Breach of Fiduciary Duty of Prudence in Violation of ERISA (29 U.S.C. § 1104(a)(1)(B))

## (Against Defendant Union Bank)

200. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

201. As alleged above, Defendant Union Bank is a fiduciary with respect to the Plan pursuant to the 2014 delegation outlined in the 2014 ERISA 3(38) Fiduciary Investment Management Agreement. It is subject to ERISA's fiduciary duties to the extent of its delegation.

202. ERISA Section 404, 29 U.S.C. § 1104, imposes fiduciary duties of prudence and loyalty upon Union Bank in connection with the selection and monitoring of Plan investments.

203. Defendant Union Bank's fiduciary responsibilities include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with appropriate care, skill, diligence, and prudence. Finally, this Defendant is obligated to ensure that the Plan's fees are reasonable, to select and retain prudent investment options, evaluate and monitor the Plan's investments on an ongoing basis and eliminate imprudent ones, and take all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty . . . to monitor investments and remove imprudent ones[.]" *Hughes*, 595 U.S. at 175; *Tibble*, 575 U.S. at 529.

204. As detailed above, Defendant Union Bank failed to prudently and objectively monitor the Plan's investments to ensure that each of the investments was and remained appropriate for the Plan. Defendant failed to remove those investments that were no longer appropriate within a reasonable time. Defendant retained imprudent funds as plan investments

despite the availability of superior alternative investments that would have cost plan participants significantly less and performed significantly better. Defendant failed to remove underperforming and costly funds.

205. Each of the actions and omissions described in Paragraph 204 above and elsewhere in this Complaint demonstrates that Defendant Union Bank failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

206. The Plan and its participants suffered millions of dollars in losses as a consequence of Defendant's fiduciary breaches.

207. Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendant Union Bank is liable to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendant made through use of Plan assets, and to restore to the Plan any profits resulting from their breaches of fiduciary duties.

208. Defendant Union Bank knowingly participated in each breach of the other Defendants, with knowledge that such acts were a breach, and enabled other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties. Each Defendant knew of the other Defendants' breaches and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Under ERISA Section 405, 29 U.S.C. § 1105(a), each Defendant is therefore also liable for the losses caused by the breaches of their co-fiduciaries.

209. Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

## SEVENTH CAUSE OF ACTION

**Knowing Participation in Fiduciary Breach**

**(Against Defendants Ostergard and Union Bank)**

210. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

211. Plaintiff has set forth several breaches of fiduciary duties, as described above, in that Defendants Crete Carrier Corporation and John and Jane Does 1-10 breached their duties of prudence and loyalty owed to Plaintiff by engaging Union Bank and participating in prohibited transactions with Union Bank.

212. Defendants Union Bank and Tonn Ostergard, insofar as they acted as non-fiduciaries, had actual or constructive knowledge of the circumstances rendering these transactions unlawful. Namely, these Defendants knew of Defendant Ostergard's financial interest in Union Bank and the additional circumstances rendering the Plan-Union Bank arrangement imprudent and disloyal. Each knew of Defendant Ostergard's simultaneous ownership in Crete Carrier and his influence over Crete Carrier's operations.

213. Plaintiff and other members of the Class have suffered damages as a result of Defendants Union Bank's and Ostergard's knowing participation in the underlying fiduciary breaches. The Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance, leading to losses in Plaintiff's and other Class members' individual accounts.

214. ERISA Section 502, 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), renders Defendants Union Bank and Ostergard liable to restore to the Plan all losses suffered as a result of their knowing participation in the underlying fiduciary breaches.

215. Wherefore, Plaintiff and putative Class Members request relief as hereinafter provided.

## PRAYER

216. For these reasons, Plaintiff and Class Members respectfully request that judgment be entered in their favor awarding the following relief:

a) A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure;

b) Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

c) A Declaration that the Plan Fiduciary Defendants and Defendant Union Bank have breached their fiduciary duties under ERISA;

d) A Declaration that the Defendant Union Bank and Defendant Ostergard (if deemed a nonfiduciary) have knowingly participated in fiduciary breaches under ERISA;

e) An Order compelling the Plan Fiduciary Defendants to personally make good to the Plan all losses to the Plan incurred as a result of Defendants' breaches of their fiduciary duties described above and to restore the Plan and its participants to the position they would have been in but for this unlawful conduct;

f) An order requiring all Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

g) Restoration of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

h) An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

i) Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan, transfer of Plan assets out of imprudent investments into prudent alternatives, and removal of fiduciaries deemed to have breached their fiduciary duties;

j) An award of pre-judgment interest;

k) An award of attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine; and

l) An award of such other and further relief as the Court deems equitable and just.

Dated: November 12, 2026

Respectfully submitted,

/s/ *Osvaldo Vazquez*
Stephen Churchill, *Application for Admission forthcoming*
Osvaldo Vazquez
Mass. Bar # 711808; Admitted to D. Neb. 10/26
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel. (617) 607-3260
Fax (617) 488-2261
steve@fairworklaw.com
oz@fairworklaw.com

*Attorneys for Plaintiff and Class Members*